IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| KAREN COBB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No.  1:12-CV-132-SPM |
| | ) |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

applications of Plaintiff Karen Cobb for Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  The parties

consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

(Doc. 17).  Because I find the decision denying benefits was supported by substantial evidence, I

will affirm the Commissioner's denial of Plaintiff's applications.

## I.    PROCEDURAL HISTORY

On December 15, 2008, Plaintiff applied for DIB and SSI, alleging a disability onset date

of May 15, 2008.  (Tr. 142-53).  Those applications were denied on February 24, 2009.  (Tr. 75-

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

79).   On April 13, 2009, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ).  (Tr. 94-96).  On October 6, 2010, after a hearing held on September 13, 2010, the ALJ issued an unfavorable decision.  (Tr. 10-18).  Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeal's Council on November 3, 2010, but on June 13, 2012, the Council declined to review the case.  (Tr. 1-6, 139-41).  Thus, the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.   FACTUAL BACKGROUND

### A.  PLAINTIFF'S TESTIMONY

At the time of her hearing before the ALJ, Plaintiff Karen Cobb was 46 years old, was five feet, six inches tall, and weighed 303 pounds.  (Tr. 29).  She completed high school and two years of college.  (Tr. 31).

Prior to her alleged onset of disability, Plaintiff worked as a caregiver, a cashier, a dietary clerk, a factory worker, a waitress, and an office manager.  (Tr. 32, 34-37).  Plaintiff last worked as a caregiver, in 2008; while doing that work, she lifted patients weighing up to 250 pounds.  (Tr. 32).  At her earlier jobs, she lifted between five and 100 pounds.  (Tr. 34-36).  On May 15, 2008, while working as a caregiver, Plaintiff discovered that she "could not stand, lift, or safely do [her] job."  (Tr. 33).  She felt she could no longer physically restrain children or walk up gravel roads, which her position required.  (Tr. 54-55).  Later in 2008, she worked as a caregiver at another facility, but she ended employment after three and a half weeks because she "just couldn't do it."  (Tr. 31-32).  Plaintiff made no further attempts to gain employment, as she "couldn't fulfill [employers'] work expectations of being a dependable worker."  (Tr. 33).

2

At the hearing before the ALJ, Plaintiff testified that her ability to work was limited by arthritis in her hands, elbows, knees, hips, the SI joint in her lower back, and her ankles and feet. (Tr. 44, 56-57).  She suffers from fibromyalgia, which makes her skin ache.  (Tr. 44, 58).  On a scale of one to 10, Plaintiff indicated the pain from arthritis and fibromyalgia was at "about an eight, and it's pretty well from my chin to my toes."  (Tr. 44).  She also has an underactive thyroid.  (Tr. 43-44).

Plaintiff also testified that she has breathing difficulties whenever she exerts herself or is in the presence of strong odors, pets, or humidity.  (Tr. 48-49).  She has high blood pressure, and at a recent doctor visit she had a blood pressure reading of 172/101.  (Tr. 43, 61).  She has heart palpitations and chest pains so intense they "literally wake [her] up" two or three times a week; she attributes these to an earlier mitral valve prolapse and states that the effects have worsened in the last four or five years.  (Tr. 49, 60-61).  Additionally, she suffers from chronic headaches, which she says "never stop, it just goes from one severity to another," and several migraines per week, which have caused her to miss work in the past and which she believes would cause her to miss four work days in every 20.  (Tr. 49-50, 59).  She suffers from depression and anxiety, cries all the time, cannot handle stress, cannot focus, and is "very, very nervous."  (Tr. 50-52, 56).  On three occasions, she has felt suicidal, and on one occasion she tried to kill herself with a firearm but was unable to break into her husband's gun cabinet.  (Tr. 52).

Plaintiff testifies that she can do "very little" in the way of household chores; it is impossible for her to vacuum, mop, or sweep because arthritis makes the required joint motion difficult.  (Tr. 38-39).  She has a hard time gripping due to swelling in her hands.  (Tr. 61-62).  She cannot make the bed, shower, comb her own hair, manipulate zippers or buttons, pull on shoes and socks, or use a knife.  (Tr. 39, 42, 63-64).  Because of her condition, she is now rarely

inclined to pursue her hobbies of painting, craftwork, and gardening.  (Tr. 41).  She cannot bend, crouch, kneel, crawl, or stoop without attendant pain; this includes the normal motion for seating oneself in a chair.  (Tr. 53).  She cannot sit for long because it hurts her hip and back.  (Tr. 38).  She cannot stand for longer than 15 minutes, cannot walk further than 25 feet without assistance, and cannot manage more than two short vertical steps.  (Tr. 53-54).  Plaintiff testified she can only lift "[a] pound or two."  (Tr. 53).

Plaintiff stated that on a typical day getting out of bed is her biggest job; she specifically cites excruciating pain in her joints, back and hip when she "turns around to get up on the side of the bed to actually stand up."  (Tr. 37, 56).  She will "work on getting dressed" and then try to fix breakfast, though she cannot follow a recipe.  (Tr. 37, 53).  After breakfast, Plaintiff naps in a recliner for thirty minutes to an hour because the medications she takes make her drowsy.  (Tr. 38).  After the nap, Plaintiff will either watch television or relocate to the porch, all while "hav[ing] to keep moving around a little bit" as she cannot sit or stand for very long.  (Tr. 38).  In the afternoon she again tries to fix something to eat, takes a nap, and watches television while "trying to move around to where [she's] comfortable."  (Tr. 39-40).  At night, Plaintiff reports that she cannot sleep; that she will "toss and turn" and when she finally does "get a little bit of a nap, it's usually right before [Plaintiff] wake[s] up completely for the day."  (Tr. 55).

Plaintiff is currently taking lisinopril,[2] HCTZ,[3] metoprolol,[4] levothyroxine,[5] estradiol,[6] naproxen,[7] tramadol,[8] a Plaquenil[9] generic, Savella,[10] and aspirin.  (Tr. 42-44, 46-48, 56-57).

---

[2] Lisinopril is used alone or in combination with other medications to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html.

[3] HCTZ, or hydrochlorothiazide, works in combination with lisinopril to treat high blood pressure.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601070.html.

[4] Metoprolol is used alone or in combination with other medications to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html.

Plaintiff was prescribed an inhaler for respiratory problems, but she could not afford to fill the prescription.  (Tr. 48).  Plaintiff stated that her pain medications reduce her pain from an "eight" to a "six or seven."  (Tr. 44, 47).  She has stated that her arthritis medication "doesn't quite do anything."  (Tr. 47).  Plaintiff also stated that most of her medications make her drowsy and that some of them make her nauseated or constipated.  (Tr. 50, 62-63).

**B. RECORDS OF TREATING AND EXAMINING SOURCES**

*1. Records of Dr. Brian P. Hauser, M.D. (October 5, 2007 – May 2, 2008)*

Between October 2007 and May 2008, Plaintiff saw Dr. Brian P. Hauser on several occasions, complaining of symptoms such as fluid retention in her leg, back pain, a knot under her right arm, and symptoms related to urinary tract and upper respiratory infections.  (Tr. 255-58, 260-63).  At the October 2007 appointment, Dr. Hauser noted that Plaintiff suffered from hypertension, an unspecified form of hypothyroidism, a history of myocardial infarction, and

---

[5] Levothyroxine, a thyroid hormone, is used to treat hypothyroidism, a condition where the thyroid gland does not produce enough thyroid hormone.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html.

[6] Estradiol, another name for estrogen, is a hormone used to replace estrogen that is normally produced by the body.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682922.html.

[7] Prescription naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis, and enclosing spondylitis.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

[8] Tramadol is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html.

[9] Plaquenil, or hydroxychloroquine, is used to treat rheumatoid arthritis in patients whose symptoms have not improved with other treatments.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601240.html.

[10] Savella, or milnacipran is used to treat fibromyalgia.  It is not used to treat depression, but belongs to the same class of medications as many antidepressants.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html.

edema.   He either prescribed or continued levothyroxine, estropipate,[11] naproxen, metoprolol, lisinopril, and HCTZ.  (Tr. 262).  At both her October 2007 and January 2008 visits, she denied wheezing, nausea, weakness, malaise, fatigue, and sleep disorder.  (Tr. 256, 261).

### 2.   *Records of Ripley County Family Clinic (February 14, 2008 – January 8, 2009)*

On February 14, 2008, Plaintiff went to the Ripley County Family Clinic ("RCFC") complaining of body ache, a sore throat, shortness of breath, tightness and wheezing in her chest, and dizziness.  Plaintiff weighed 319 pounds, and her blood pressure was 118/68.  Her breathing was "wheezy" and she had an abnormal EKG.  Plaintiff was advised to "go to . . . ER NOW."[12] (Tr. 274).

On September 26, 2008, Plaintiff returned to RCFC and reported major joint pain all over her body; on a scale of one to ten, she described the pain as an eight or nine.  (Tr. 273).

On October 23, 2008, Plaintiff returned to RCFC, complaining of cold symptoms.  (Tr. 272).  A chest X-ray revealed no acute cardiopulmonary disease.[13] (Tr. 280).

On January 8, 2009, another chest X-ray indicated no active pulmonary disease.  (Tr. 353).

### 3.   *Consultative Examination by Dr. Chul Kim, M.D. (January 26, 2009)*

On January 26, 2009, Plaintiff saw Dr. Chul Kim, an internist, on referral from the Missouri Department of Elementary and Secondary Education Section of Disability Determinations.  (Tr. 293).  Plaintiff weighed 311 pounds, and her blood pressure was 104/74. (Tr. 295).   She reported arthritis pain in multiple joints; breathing problems; hypertension;

---

[11] Estropipate is an estrogen female hormone.  It treats the symptoms of menopause or removal of the ovaries.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000686/.

[12] The transcript does not appear to contain a record of this ER visit.

[13] Much of this record is illegible.

hypothyroidism; headaches; dizziness, and heart problems, including monthly black out spells accompanied by heart palpitations, arm tingling, and shortness of breath.  (Tr. 293-95).

On examination, Dr. Kim described Plaintiff's joints and extremities as having some limited range of motion in her back and in most joints, and she had some stiffness and pain getting up from a chair and getting on and off the examining table."  (Tr. 296-98).  Her handgrip was 4/5 bilaterally and her fine finger movements were normal.  (Tr. 296).  Her heart had a regular rhythm with no murmurs.  Her lungs had decreased breath sounds, but she was not in respiratory distress.  Her mental state was clear with good memory.  (Tr. 295).

Dr. Kim diagnosed probable osteoarthritis in multiple joints; chronic obstructive lung disease; hypertension; hypothyroidism; mitral valve prolapse syndrome that gives her the feeling of palpitations, dyspnea, and intermittent black out spells; morbid obesity; chronic headaches; and dizziness.  (Tr. 296).

### 4.  Records of Dr. Jean Diemer, M.D. (February 17, 2009)

On February 17, 2009, an X-ray of Plaintiff's left knee showed no erosive changes or joint effusion but showed tricompartmental degenerative changes.  (Tr. 300).  An X-ray of the lumbar spine on the same day showed no fracture or subluxation and no erosive changes of the SI joints but showed facet sclerosis and hypertrophy, suggesting "some degenerative change." (Tr. 301).

### 5.  Records of Ripley County Family Clinic (April 30, 2009 – July 17, 2009)

On April 30, 2009, Plaintiff went to RCFC, complaining of joint pain in her feet and lower back.  (Tr. 343).  She reported taking her husband's naproxen with good results.  (Tr. 343).

On May 27, 2009, Plaintiff again went to RCFC, complaining of joint pain and swelling. (Tr. 342).  An X-ray of her right hand showed results "within normal limits."  (Tr. 352).

**6.   *Records of Dr. Emilia Dulgheru, M.D., (September 29, 2009 – November 5, 2009***

On September 29, 2009, Plaintiff saw Dr. Emilia Dulgheru, M.D., a rheumatologist, complaining of joint stiffness; joint swelling; pain in her chest, back, knees, hips, feet, and hands; heart palpitations; shortness of breath; wheezing; fatigue; and poor appetite.  (Tr. 309-313).  She reported that her back and knees "were always hurting" and that two years prior she had started experiencing hand pain as well, which was accompanied by swelling on the right side which progressed from third to second digit.  (Tr. 312).  On examination, Dr. Dulgheru found some slight swelling and tenderness in her hands; pain and restricted motion in her wrist; and a diminished range of motion in her shoulders, hips, ankles; and back.  (Tr. 313).  Dr. Dulgheru diagnosed Plaintiff with unspecified inflammatory polyarthropathy, lumbago, "myalgia and myositis unspecified," and enthesopathy of the hip region.  He noted that she had "multiple tender points suggestive of fibromyalgia."   He prescribed prednisone[14] for the unspecified inflammatory polyarthropathy.  (Tr. 310).

On November 5, 2009, Plaintiff returned with many of the same complaints as she had at her previous appointment.   (Tr. 314-27).[15]   An examination of the feet revealed a posterior/inferior right calcaneal spur, no evidence of acute osseous abnormality, and no significant hypertrophic or erosive changes.  (Tr. 323).  An examination of the sacroiliac joints was negative.  (Tr. 324).  Dr. Dulgheru discontinued prednisone, started Plaintiff on Plaquenil, and refilled her naproxen prescription.  (Tr. 314).

---

[14] Prednisone reduces swelling and redness.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html.

[15] The Court notes that many of these pages are partially or completely unreadable.

8

### 7.   Records of Dr. Rickey L. McGath, M.D. (May 10, 2010 – June 24, 2010)

On May 10, 2010, Plaintiff saw Dr. Rickey L. McGath, M.D., complaining of a lot of pain in her hands, shoulders, and the bottoms of her feet and of muscle spasms in her back.  (Tr. 333-35).  Notes stated that Plaintiff had been on prednisone for 6 weeks without a change in her symptoms.  (Tr. 333-334).  Plaintiff denied trouble from headaches, dyspnea, chest pain or discomfort, heart palpitations, nausea, abdominal pain or vomiting, localized joint swelling or stiffness, anxiety, depression, or sleep disturbance.  (Tr. 335).  On examination, Dr. McGath noted tenderness in Plaintiff's hands, back, shoulders, and plantar fascia bilaterally; he also noted "abnormalities" in the hands, wrist, shoulder, and foot.  (Tr. 336).  Plaintiff appeared alert and oriented to time, place, and person; her mood was euthymic; lung rhythm and depth were normal and clear to auscultation; heart rate and rhythm was normal; and no heart murmurs or edema were detected.  (Tr. 335-36).  Dr. McGath's assessment was that Plaintiff had feelings of weakness, arthritis, plantar fasciitis, and myalgia and myositis.  (Tr. 336).  He prescribed trials of Ultracet[16] and Savella and told Plaintiff to discontinue use of prednisone.  (Tr. 337).

On May 24, 2010, Plaintiff saw Dr. McGath to follow up on the Savella prescription.  She stated that the "med is working and [she] feels much better" and that she had experienced a "dramatic reduction" in symptoms, but complained of dizziness, a "marked reduction in appetite," and sweating more than usual.  On review, Plaintiff reported no headaches, dyspnea, chest pain or discomfort, heart palpitations, nausea, abdominal pain or vomiting, localized joint swelling or stiffness, anxiety, depression, or sleep disturbance.  On examination, Dr. McGath noted that Plaintiff appeared alert, and oriented to time, place, and person; lung rhythm and depth

---

[16] Ultracet combines acetaminophen and tramadol and is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html

were normal and clear to auscultation; heart rate and rhythm were normal; and her musculoskeletal system was normal.  (Tr. 330).  Dr. McGath's assessment was arthritis, plantar fasciitis, and myalgia and myositis.  Dr. McGath continued her Savella prescription and noted, "fibromyalgia and obesity improved."  (Tr. 331).

On June 24, 2010, Plaintiff returned, complaining of swelling and stiffness in her hands. On review, Plaintiff again reported no dyspnea, chest pain or discomfort, or heart palpitations. (Tr. 328).  On examination, Dr. McGath noted that Plaintiff appeared alert and oriented to time, place, and person; lung rhythm and depth were normal and clear to auscultation; heart rate and rhythm was normal with no murmur or edema; and her musculoskeletal system was "normal." (Tr. 328-29).  Dr. McGath assessed arthritis, myalgia, and myositis.  He also stated that she had a "vesicle on her finger which needs to be rechecked."  He prescribed prednisone and continued Plaintiff's Savella and tramadol prescriptions.  (Tr. 329).

### 8.  *Records of Kurt G. Zimmer, D.O. (July 7, 2010 – August 9, 2010)*

On July 7, 2010, Plaintiff saw Dr. Zimmer on referral from Dr. McGath.  (Tr. 354). Dr. Zimmer noted that Plaintiff's hands "showed abnormalities" and "[s]eem[ed] a little swollen," and that "and shaking her hand in greeting elicit[ed] discomfort."  On examination, Dr. Zimmer noted that Plaintiff appeared alert, and oriented to time, place, and person and had a euthymic mood.  (Tr. 354).  Dr. Zimmer assessed Plaintiff as having rheumatoid arthritis, told her to come back if her condition worsened or new symptoms arose, continued her current medications, and referred her to a rheumatologist.  (Tr. 354-55).

Dr. Zimmer ordered a rheumatoid arthritis test, and results dated August 9, 2010, appear to indicate that it was negative.  (Tr. 363).

## C.  VOCATIONAL EVIDENCE

Vocational Expert Jeffrey F. Mcgrowski testified at the hearing before the ALJ.  (Tr. 64-69).  He characterized several of Plaintiff's past jobs as medium, heavy, or very heavy.  (Tr. 65-66).   However, he found that Plaintiff's past work as an office manager was light as she described it, and can be a skilled, sedentary job in the national economy, and he gave a sample *Dictionary of Occupational Titles* (*DOT*) number of 169.167-034.  (Tr. 66).

The ALJ posed the following hypothetical to the VE:

> Please assume a person the age of 46 with a high school education, and the past relevant work experience that you have identified.  Please assume I find that this person capable of performing the exertional demands of sedentary work as defined in the Social Security regulations.  [S]pecifically the person could lift, carry, push, pull 10 pounds occasionally, less than 10 pounds frequently; sit for six out of eight, stand or walk for two out of eight for a total of eight out of eight. The person will need a sit/stand option during the day; occasional climb, balance, stoop, crouch, kneel, crawl; no exposure to ladders, ropes, or scaffolds; no concentrated exposure to dust, fumes, gases, chemicals, and humidity.  According to that hypothetical, would there be any transferable work skills?

The VE testified that he believed Plaintiff would have transferable work skills from her office manager job, specifically the skills to schedule appointments and communication skills to deal with co-workers, as well as other clerical-type skills.  (Tr. 67).   When the ALJ asked if the hypothetical restrictions could affect the performance of past work, the VE responded in the negative, and stated that Plaintiff could still work as an office manager "as performed in the national economy" (about 5,000 jobs in the state).  (Tr. 67-68).   When asked what other jobs the hypothetical person was capable of doing, the VE offered as examples appointment clerk (*DOT* No. 237.367-010; 4,000 in the state; over 150,000 nationally) and order clerk (*DOT* No. 249.362-026; 3,000 in the state; 300,000 nationally).  (Tr. 68).

11

Upon questioning by Plaintiff's attorney, the VE testified that if the person described in the ALJ's hypothetical suffered from migraine headaches that made her miss at least three days of work a month, there would not be any jobs available for that person.  He also testified that if the hypothetical person had to take breaks in addition to those regularly allowed, it would be "very difficult for her to maintain a job."  (Tr. 69).

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's]

physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.   20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled.  *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the

claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

Applying the foregoing five-step analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity after her alleged onset of disability.  While she worked after the alleged onset of disability, the judge determined that employment did not constitute substantial gainful activity.  (Tr. 12).  The ALJ found that Plaintiff suffered "one or more impairments satisfying the more-than-slight threshold requirement of being 'severe' pursuant to the Social Security disability case 'sequential evaluation' analysis structure, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in 20 C.F.R. §§ 404.1520(d), 416.920(d), 404, Subpt. P, App'x. 1. (Tr. 12-13).  The ALJ found that Plaintiff was restricted to sedentary work, "probably on the basis of sheer obesity more so than any [other underlying condition]."  (Tr. 16).  Plaintiff's RFC was determined to allow: for alternate sitting and standing as needed; no climbing of ropes, ladders, or scaffolds; no more than occasional climbing of ramps or stairs, as well as no more than occasional balancing, stooping, kneeling, crouching, or crawling; and no concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants.  (Tr. 14).  Sedentary work involves lifting or carrying no more than 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools.

The ALJ found Plaintiff's previous work as an office manager was performed for substantial earnings and was therefore vocationally relevant.  (Tr. 14).  Relying on the testimony of the VE, the ALJ concluded that considering Plaintiff's work experience and RFC, there are

jobs that exist in significant numbers (5,000 office manager jobs, 7,000 semi-skilled other sedentary jobs) in the State of Missouri that Plaintiff can perform using transferable clerical and managerial skills from her previous office manager jobs.  (Tr. 14-15).  The ALJ concluded that because Plaintiff is physically and mentally capable of performing past relevant work notwithstanding her impairments and allegations, she is not disabled.  (Tr. 16, citing 20 C.F.R §§ 404.1520(f), 416.920(f)).

In appealing the ALJ's decision, Plaintiff contends the ALJ's decision should be reversed because (A) the ALJ failed to consider the additional and cumulative effects Plaintiff's obesity had with regard to her other impairments making it impossible for the ALJ to properly evaluate Plaintiff's RFC; and (B) that the ALJ erred in his duty to fully and completely develop the record with regard to Plaintiff's mental condition and its effect on her RFC.

## V.   DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations

regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  "If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. THE ALJ'S ASSESSMENT OF THE ADDITIONAL AND CUMULATIVE EFFECTS OF PLAINTIFF'S OBESITY ON PLAINTIFF'S RFC

Plaintiff argues that the ALJ failed to consider the additional and cumulative effects her obesity had with regard to her other impairments, making it impossible for the ALJ to properly evaluate Plaintiff's RFC.  The Social Security Administration recognizes that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately."  20 C.F.R. § 404 Subpt. P, App'x 1, § 1.00(Q).  *See also* SSR 02–1p, 2000 WL 628049, at *3 (Sept. 12, 2002) (discussing how individuals with obesity are at a greater than average risk of developing numerous other impairments).  Thus, at all stages of the sequential evaluation process, including the RFC determination, "adjudicators must consider any additional and cumulative effects of obesity."  20 C.F.R. 404, Subpt. P, App'x 1, § 1.00(Q).

Here Plaintiff's assertion that the ALJ did not consider the additional or cumulative effects of her obesity is simply not supported by an examination of the ALJ's decision.  First, the ALJ considered Plaintiff's obesity throughout his decision, repeatedly mentioning her weight and/or the fact that she was obese.  (Tr. 11, 13, 16, 17).  Second, the ALJ stated that Plaintiff's obesity played a key role in his decision to limit her to a sedentary RFC, stating that Plaintiff "is restricted to sedentary work probably on the basis of sheer obesity more so than any underlying

musculoskeletal, cardiovascular disease or respiratory impairment." (Tr. 16).[17] Third, the ALJ made express findings regarding the effects of Plaintiff's obesity, by itself and in combination with her other impairments, on her RFC, stating:

> There is also no credible evidence that [Plaintiff's] obesity, although contributing to some diminution in ordinary mobility and stamina, reduces the claimant's overall functional abilities, either by itself or in combination with other medically established impairments in this case, any further than the residual functional capacity the Administrative Law Judge has determined as a finding in this decision.

(Tr. 13).

In sum, it is clear that the ALJ gave significant consideration to Plaintiff's obesity in determining Plaintiff's RFC. *See Heino v. Astrue*, 578 F.3d 873, 881-82 (8th Cir. 2009) (holding that the ALJ adequately took into account a claimant's obesity where the ALJ "made numerous references on the record" to claimant's obesity, noted her weight and height, and included "has a history of obesity" in the hypothetical to the VE); *Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1153 (8th Cir. 2004) (finding that an ALJ adequately considered obesity when he referred to it when evaluating claimant's case).

Furthermore, the ALJ's finding that there was "no credible evidence" that Plaintiff's obesity reduced Plaintiff's functional abilities beyond the limitations imposed in the RFC was supported by substantial evidence in the record. (Tr. 13). The ALJ "must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). As part of the RFC determination, the ALJ must evaluate Plaintiff's credibility as required under *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

---

[17] The Court also notes that the ALJ's limitation of Plaintiff to sedentary work is "in itself a significant limitation." *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)

Cir. 1984).  More specifically, the ALJ must consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Here, the ALJ properly analyzed Plaintiff's credibility before discrediting her subjective complaints of limitations that would have precluded even sedentary work.[18]  The ALJ discussed in detail several of the credibility factors, including Plaintiff's daily activities, the intensity and frequency of her pain, her "steady but mostly mediocre work record," and the absence of any significant, uncontrollable side effects from her medications.  (Tr. 11, 12, 15).  He also properly considered the fact that no doctor who treated or examined Plaintiff, including Dr. Hauser, Dr. Dulgheru, Dr. McGath, Dr. Zimmer, or anyone at the RCFC, implied that she was disabled or imposed any specific long-term limitation on her ability to stand, sit, walk bend, lift, carry, or do other exertional activities.  (Tr. 15, 255-58, 260-63, 272-74, 280, 293-96, 300-01, 310-315, 323-324, 328-337, 341-343, 352-355, 363).  *See Raney v. Barnhart*, 396 F.3d 1007, 1011 (8th Cir. 2005) (finding that the ALJ properly considered the absence of any doctor's opinion stating that the claimant was disabled while conducting his credibility analysis).

The ALJ also properly considered the fact that the medical evidence did not fully support, and in some cases contradicted, Plaintiff's complaints of frequent heart palpitations, shortness of breath, debilitating pain from rheumatoid arthritis and fibromyalgia, and frequent headaches. (Tr. 12-17).  In May 2010, after starting treatment with Ultracet and Savella, Plaintiff reported feeling

---

[18] Plaintiff does not challenge the ALJ's credibility finding.

"much better" and having a "dramatic reduction" in symptoms (Tr. 330); she claimed no trouble from shortness of breath or heart palpitations on several occasions in 2010 (Tr. 328, 330, 335); X-rays of her lungs in 2008 and 2009 showed no active pulmonary disease or other acute process (Tr. 280, 353); her heart was repeatedly described as regular and without murmur in 2007, 2008, and 2010 (Tr. 257, 261, 328-29, 331, 336); tests of her right hand, left knee, bilateral feet, sacroiliac joints, and lumbar spine in 2009 were normal or showed moderate changes (Tr. 300-01, 323, 324, 352); and Plaintiff only rarely told her medical providers that she had headaches (Tr. 295-96, 313, 330, 335).  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) ("[A]n ALJ may not discount allegations of disabling pain solely on the lack of objective medical evidence.  However, lack of objective medical evidence is a factor an ALJ may consider.") (internal citation omitted); *Gonazales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) ("A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question.").

In sum, the Court concludes that the ALJ adequately considered Plaintiff's obesity and that there was substantial evidence in the record as a whole to support his finding that obesity did not contribute to limitations more restrictive than the limitations in the RFC.

### C. THE ALJ'S DUTY TO DEVELOP THE RECORD WITH REGARD TO PLAINTIFF'S MENTAL CONDITION

Plaintiff contends that the ALJ erred by failing to develop the record to determine the extent of Plaintiff's mental problems, an error that affected both the RFC assessment and the questions posed to the VE.

It is well settled that "the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *Landess v.*

*Weinberger*, 490 F.2d 1187, 1188 (8th Cir. 1974)). If sufficient evidence alerts the ALJ to the possibility of a severe mental impairment, the ALJ must further develop the record about mental impairments before ruling on the severity of the claimant's impairment(s). *See Gasaway v. Apfel*, 187 F.3d 840, 843 (8th Cir. 1999); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) ("[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.") (citation and internal quotes omitted)). However, a record is not necessarily undeveloped simply because it fails to support the claimant's claims. *Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004). When there is little evidence of an alleged impairment and "substantial evidence to the contrary," an ALJ can make an informed decision without having to develop the record further. *See Byes v. Astrue,* 687 F.3d 913, 917 (8th Cir. 2012)*.*

In this case, Plaintiff argues that both her testimony and medical records are replete with references to her depression and anxiety, and she testified that her doctors said she had "pretty bad" depression and had problems with anxiety. (Tr. 50-53, 56-57). However, Plaintiff does not direct the Court to any medical records suggesting that she has mental impairments, nor does the Court's review of the record reveal any indication of any mental impairments in her medical records. The only medical evidence Plaintiff cites that even arguably suggests the existence of any mental impairment is the fact that Dr. McGath prescribed Savella for Plaintiff, a drug that belongs to the same class of drugs as antidepressants. (Tr. 45, 56-57, 337). However, as Plaintiff acknowledges in her brief, Savella is prescribed to treat fibromyalgia, not depression. (Pl's. Br. 6); *see also* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html. At the time he prescribed Savella, Dr. McGath had diagnosed Plaintiff with "[f]eelings of weakness," arthritis, plantar fasciitis, myalgia, and myositis, but not with depression or anxiety. (Tr. 336-37).

Contrary to Plaintiff's contention, the medical records that do address mental issues suggest no mental impairments were present. Although she saw many doctors on numerous occasions, Plaintiff does not appear to have ever complained to them of depression or anxiety. Moreover, her doctors repeatedly noted that her psychiatric condition was normal or unremarkable. On January 26, 2009, Dr. Kim observed Plaintiff's mental state was clear with good memory. (Tr. 295). On May 10, 2010, Dr. McGath found Plaintiff alert and oriented to time, place, and person; her mood was euthymic; her psychiatric exam was "normal;" and she reported no anxiety or depression. (Tr. 335-36). He made similar findings on May 24, 2010 and June 24, 2010. (Tr. 328, 330-31). On July 7, Dr. Zimmer observed Plaintiff as alert and oriented to time, place, and person; her mood was euthymic. (Tr. 354).

In addition, the fact that Plaintiff never sought any treatment for mental impairments weighs against a finding of disabling mental impairments. *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [a claimant's] mental capabilities disfavors a finding of disability."); *Vanlue v. Astrue*, No. 4:11CV595 TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal and conservative treatment and had never required more aggressive forms of mental health treatment).

Finally, the Court notes that it is significant that Plaintiff's initial application for disability benefits contained no reference to mental impairment. (Tr. 189-201). *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (stating that the fact that claimant "did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed").

21

The above evidence provided a sufficient basis by which the ALJ could make an informed decision about Plaintiff's mental impairments without further developing the record. Because there is no medical evidence that Plaintiff had any mental impairments and there is substantial evidence to the contrary, the ALJ had sufficient evidence on which to make a finding that Plaintiff had no severe mental impairments; he was not required to develop the record further. *See Byes v. Astrue,* 687 F.3d 913, 917 (8th Cir. 2012).

### VI.   <u>CONCLUSION</u>

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum Opinion.


<u>/s/Shirley Padmore Mensah</u>
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this <u>17th</u> day of <u>July</u>, 2013.